**Christopher Scott EMMETT, Petitioner–Appellant,**

v.

**Loretta K. KELLY, Warden, Sussex I State Prison, Respondent–Appellee.**

No. 06–14.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 26, 2006.

Decided Jan. 23, 2007.

Before TRAXLER, GREGORY, and SHEDD, Circuit Judges.

Affirmed by published opinion. Judge TRAXLER wrote the majority opinion, in which Judge SHEDD joined. Judge GREGORY wrote an opinion concurring in part and dissenting in part.

TRAXLER, Circuit Judge.

Appellant Christopher Scott Emmett was convicted by a Virginia jury of the capital murder and robbery of his coworker, John Langley, and sentenced to death. The Supreme Court of Virginia affirmed, see *Emmett v. Commonwealth,* 264 Va. 364, 569 S.E.2d 39 (2002), and the United States Supreme Court denied certiorari, *see Emmett v. Virginia,* 538 U.S. 929, 123 S.Ct. 1586, 155 L.Ed.2d 324 (2003). After unsuccessfully challenging his conviction and sentence in state habeas proceedings, Emmett filed a petition for writ of habeas corpus in federal district court. *See* 28 U.S.C.A. § 2254 (West 1994 & Supp.2006). The district court denied his application for relief, and declined to issue a certificate of appealability. We granted a certificate of appealability to review two claims. See 28 U.S.C.A. § 2253(c)(1) (West Supp.2006). For the reasons set forth below, we affirm.

## I.

In the early morning hours of April 27, 2001, Emmett beat his sleeping coworker John Langley to death with the base of a brass motel room lamp in order to rob Langley and use his cash to buy crack cocaine. The circumstances of the murder were described by the Virginia Supreme Court as follows:

Weldon Roofing Company employed Emmett and Langley as laborers for its roofing crews. During late April 2001, both men were assigned to a project in the City of Danville and shared a room

**ARGUED:** Matthew Leland Engle, Virginia Capital Representation Resource Center, Charlottesville, Virginia, for Appellant. Steven Andrew Witmer, Office of the Attorney General of Virginia, Richmond, Virginia, for Appellee. **ON BRIEF:** William H. Lindsey, Salem, Virginia, for Appellant. Robert F. McDonnell, Attorney General of Virginia, Jerry P. Slonaker, Senior Assistant Attorney General, Office of the Attorney General Of Virginia, Richmond, Virginia, for Appellee.

at a local motel where the roofing crew was staying. On the evening of April 26, 2001, Emmett, Langley, Michael Darryl Pittman, and other members of the roofing crew cooked dinner on a grill at the motel, played cards, and drank beer. During the course of the evening, Langley loaned money to Emmett and Pittman, who used the money to buy crack cocaine.

At approximately 11:00 p.m. that evening, Rainey Bell, another member of the roofing crew, heard a noise he described as "bang, bang" coming from the room Emmett and Langley shared. Shortly after midnight, Emmett went to the motel office and asked the clerk to call the police, saying that he had returned to his room, "seen blood and stuff ... and didn't know what had took place."

The police arrived at the motel at 12:46 a.m. on April 27, 2001 and accompanied Emmett back to his room. There they discovered Langley's dead body lying face down on Langley's bed beneath a comforter. Blood spatters were found on the sheets and headboard of Langley's bed, on the wall behind it, and on the wall between the bathroom and Emmett's bed. A damaged brass lamp stained with Langley's blood was discovered beneath Langley's bed.

In his initial statement to police, Emmett denied killing Langley. He stated that he had returned to the room and gone to bed. Emmett claimed to have discovered the blood and Langley's body later that night when he got up to use the bathroom. Observing what appeared to be bloodstains on Emmett's personal effects, the police took possession of Emmett's boots and clothing with his permission. Emmett suggested that the blood might be his own because he had injured himself earlier in the week. Subsequent testing, however, revealed that Emmett's boots and clothing were stained with Langley's blood.

Later in the morning of April 27, Emmett voluntarily accompanied the police to the Danville police station. There he agreed to be fingerprinted and gave a sample of his blood. Emmett admitted to the police that he had been drinking and using cocaine on the previous evening. Over the course of the next several hours, Emmett related different versions of the events of the previous evening to the police. He first implicated Pittman as Langley's murderer, but ultimately Emmett told the police that he alone had beaten Langley to death with the brass lamp.

Emmett was given *Miranda* warnings and he gave a full, taped confession. Emmett stated that he and Pittman decided to rob Langley after Langley refused to loan them more money to buy additional cocaine. Emmett stated that he struck Langley five or six times with the brass lamp, took Langley's wallet, and left the motel to buy cocaine.

*Emmett,* 569 S.E.2d at 42–43. "[B] ased upon the amount of blood and bruising of [Langley's] brain tissue at the point of impact," the medical examiner opined that "Langley was not killed immediately by the first blow from the lamp[, but] might have been unconscious after the first blow was struck and may have suffered 'brain death' prior to actual death." *Id.* at 43.

At the conclusion of the guilt phase of Emmett's bifurcated trial, Emmett was convicted by a jury of the capital murder and robbery of Langley. At the separate sentencing hearing, the Commonwealth sought the death penalty based upon Virginia's statutory aggravating factors of future dangerousness and of vileness based upon aggravated battery and depravity of mind. See Va.Code Ann. § 19.2–264.2

(2004) ("In assessing the penalty of any person convicted of an offense for which the death penalty may be imposed, a sentence of death shall not be imposed unless the court or jury shall (1) after consideration of the past criminal record of convictions of the defendant, find that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing serious threat to society or that his conduct in committing the offense for which he stands charged was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim; and (2) recommend that the penalty of death be imposed.").

In support of the future dangerousness factor, the prosecutor presented Emmett's prior criminal history, to the extent it could be determined. The history presented consisted of juvenile convictions for felonious larceny and for assault and battery arising from an incident in which Emmett, while incarcerated in a maximum-security juvenile detention facility, rushed a guard and locked him in a closet in order to escape.[1] In addition, the prosecutor presented evidence of an adult conviction for involuntary manslaughter arising from an incident in which Emmett, while driving a van in the wrong direction and under the influence of alcohol, struck and killed a motorcyclist. Testimony was presented that the drunken Emmett was smiling after the driver was killed and told an officer " 'that there was no need to worry about the man on the motorcycle. He was already dead, and that [Emmett] could do nothing to help him.' " *Id.* at 43 (alteration in original). As noted by the state court,

[t]he evidence ... showed that Emmett lacked remorse for this earlier violent crime and for the instant killing of a co-worker. Indeed, Emmett himself confessed that he killed Langley simply because it "just seemed right at the time." Such lack of regard for a human life speaks volumes on the issue of future dangerousness and leaves little doubt of its probability.

*Id.* at 45.

In support of the vileness factor, the prosecutor highlighted to the jury the aggravated nature of the beating that Emmett inflicted upon his victim. As noted by the state court, Emmett's actions demonstrated both aggravated battery and depravity of mind. Specifically, "[t]he use of a blunt object to batter the skull of the victim repeatedly and with such force that blood spatters several feet from the victim is clearly both qualitatively and quantitatively more force than the minimum necessary to kill the victim." *Id.*; *see also Smith v. Commonwealth,* 219 Va. 455, 248 S.E.2d 135, 149 (1978) (defining an "aggravated battery" as "a battery which, qualitatively and quantitatively, is more culpable than the minimum necessary to accomplish an act of murder"). Additionally, "[t]he evidence established that Emmett violently attacked a co-worker with whom he had apparently enjoyed an amicable relationship. The brutality of the crime amply demonstrates the depravity of mind involved in the murder of Langley." *Id.* at 45–46, 248 S.E.2d 135; *see also Smith,* 248 S.E.2d at 149 (defining "depravity of mind" as a "degree of moral turpitude and psychical debasement surpassing that inherent in the definition of ordinary legal malice and premeditation").

---

1.  As related in the prosecutor's affidavit filed in the habeas proceedings, the prosecutor was unable to establish why Emmett was incarcerated as a juvenile. Emmett's juvenile criminal record had been destroyed pursuant to North Carolina procedure, and, as set forth *infra,* defense counsel intentionally avoided opening the door to Emmett's extensive juvenile criminal history.

In mitigation, Emmett presented testimony from his mother, Barbara McAdams, and a half-sister with whom he was raised, Lauri McAdams. Mrs. McAdams testified that Emmett's natural father was an abusive alcoholic who failed to take care of his family. She testified that she ultimately left her husband and remarried the man who raised Emmett. Mrs. McAdams testified that in the months leading up to Langley's murder, she began to notice troubling changes in Emmett's behavior. Although Emmett had been a good parent to his young daughter, he stopped spending time with her, buying her the things that she needed, and paying his child support as he had always done in the past. Similarly, Mrs. McAdams testified that Emmett regularly visited her and her husband, spending time fishing with his stepfather and helping with various house and yard chores, but had stopped visiting them during these months as well.

Emmett's half-sister, Lauri McAdams, testified that she was living with her mother and father in the months leading up to the murder and also noticed these changes in Emmett's behavior. Lauri confirmed that Emmett "used to come to my parents' house just about every weekend, and he would help my Dad whenever my Dad needed help," but that in the six months before the murder he became "real distant" and "stopped coming over." J.A. 168. She also testified that Emmett had disappeared for a weekend after receiving his tax refund, then returned to her parents' home claiming that he never received it.

A family friend, Linda Butler, was the owner of the van Emmett was driving when he struck and killed the motorcyclist, and she also testified on Emmett's behalf. Mrs. Butler described Emmett as a caring and respectful person who often helped her, her disabled husband, and her son with home repairs and yard work. She testified that Emmett also helped care for her son in 1995 after he was injured and unable to walk. Emmett would often stop by their home when he finished his work to help them with whatever they needed, including carrying her son to and from the bathtub and taking turns sleeping beside her son's bed to give the parents a break from their caregiving functions.

In addition to these family members and friends, Emmett called three witnesses to support a claim that he would not pose a future danger if given a life sentence. Gary Bass, Chief of Operations for the Virginia Department of Corrections, testified that any person convicted of murder and given a life sentence would be classified as a level six inmate, the highest security level classification, and that while he could work his way down to level two at best, he would not be allowed outside the prison at any level. Michael Ellis with Green Correctional Institution testified that from October 1998 to January 1999, while Emmett was serving his sentence for vehicular manslaughter, Emmett was a member of Ellis's inmate crew working in the community. Ellis did not recall having any problems with Emmett. And, Captain Horne, Jail Administrator for the City Jail, testified that with the exception of one incident in which Emmett was talking loudly in his cell block, Emmett had committed no disciplinary infractions while awaiting trial at the jail on his murder charge.

Through this testimony, counsel was able to argue to the jury in mitigation that Emmett was not a monster or career criminal, but a good and decent person whose addictions to alcohol and cocaine overwhelmed his judgment and ultimately resulted in his undoing. In prison for life, counsel pointed out, Emmett would be re-

moved from his temptations and would pose no future danger to others there.

At the conclusion of the sentencing hearing, the jury returned a verdict finding both statutory aggravating factors, weighed the aggravating and mitigating evidence, and recommended a sentence of death, which was subsequently imposed by the trial court. On mandatory post-conviction review, the Virginia Supreme Court affirmed the conviction and sentence, and the United States Supreme Court denied certiorari.

In state post-conviction proceedings, Emmett alleged, *inter alia,* that his counsel was constitutionally ineffective during the sentencing phase of his trial because he (1) failed to perform an adequate investigation into Emmett's family and social background, and (2) failed to request the assistance of a toxicologist or substance abuse expert to present evidence of Emmett's level of intoxication at the time of the murder. The state habeas court denied Emmett's petition and denied Emmett's petition for rehearing. Pursuant to 28 U.S.C.A. § 2254, Emmett then filed this petition for a writ of habeas corpus in the district court. The district court denied the petition, and declined to issue a certificate of appealability under 28 U.S.C.A. § 2253. We issued a certificate of appealability to review the two claims set forth above.

## II.

▇ The Sixth Amendment requires that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence," U.S. Const. amend. VI, and that such assistance be effective, see *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to establish a claim for ineffective assistance of counsel, Emmett must demonstrate

"that counsel's performance was deficient" and that "the deficient performance prejudiced the defense." *Id.* at 687, 104 S.Ct. 2052. To demonstrate inadequate performance, Emmett "must show that counsel's representation fell below an objective standard of reasonableness" measured by "prevailing professional norms." *Id.* at 688, 104 S.Ct. 2052. To demonstrate prejudice, Emmett "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. In death sentence challenges such as this, "the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695, 104 S.Ct. 2052.

▇ Pursuant to the limits on federal habeas review of a state conviction, when a habeas petitioner's constitutional claim has been "adjudicated on the merits in State court proceedings," we may not grant relief unless the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.A. § 2254(d) (Supp. 2006). A state court's decision is contrary to clearly established federal law under § 2254(d) where it "applies a rule that contradicts the governing law set forth" by the United States Supreme Court or "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives

at a result different from [that] precedent." *Williams v. Taylor,* 529 U.S. 362, 405–06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court's decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Id.* at 407, 120 S.Ct. 1495. Factual determinations made by the state court "shall be presumed to be correct," and "[t] he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C.A. § 2254(e)(1) (Supp.2006).

### III.

We begin with Emmett's claim that counsel's investigation into his childhood was constitutionally deficient because he failed to interview each of Emmett's siblings and half-siblings and failed to request records from Emmett's court-ordered mental health counseling as a juvenile. Emmett argues that these sources of information would have alerted counsel that Emmett was raised in an environment of poverty, poor housing, hunger, neglect, and physical abuse, which led him to an early, persistent, and lifelong criminal path. Emmett further contends that had his jury been presented with such additional evidence, "there is a reasonable probability that at least one juror would have struck a different balance." *Wiggins v. Smith,* 539 U.S. 510, 537, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003).

### A.

▮ It is well established under *Strickland* and its progeny that trial counsel's failure to conduct an "adequate investigation in preparing for the sentencing phase of a capital trial" may amount to ineffective assistance. *Rompilla v. Beard,* 545 U.S. 374, 380, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005); see *Wiggins,* 539 U.S. at 521–22, 123 S.Ct. 2527. In the course of representation, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052.

It is also well established, however, "that *Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing," *Wiggins,* 539 U.S. at 533, 123 S.Ct. 2527, or "impose a constitutional requirement that counsel uncover every scrap of evidence that could conceivably help their client," *Tucker v. Ozmint,* 350 F.3d 433, 442 (4th Cir.2003) (internal quotation marks omitted). "[T]he *Strickland* test of necessity requires a case-by-case examination of the evidence," *Williams,* 529 U.S. at 391, 120 S.Ct. 1495 (internal quotation marks omitted), and counsel's decision not to investigate or to cease investigation in a particular area "must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments," *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052. In all such cases,

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to

evaluate the conduct from counsel's perspective at the time.

*Strickland,* 466 U.S. at 689, 104 S.Ct. 2052 (internal citations omitted); *see also Rompilla,* 545 U.S. at 381, 125 S.Ct. 2456 ("In judging the defense's investigation, as in applying *Strickland* generally, hindsight is discounted by pegging adequacy to 'counsel's perspective at the time' investigative decisions are made, and by giving a 'heavy measure of deference to counsel's judgments.'" (quoting *Strickland,* 466 U.S. at 689, 691, 104 S.Ct. 2052) (internal citations omitted)).

### B.

With these principles in mind, we now "reconstruct the circumstances of counsel's challenged conduct," and consider the timeliness and scope of the investigation performed by counsel, the fruits of that effort, and the decisions counsel made as a result of it. *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052.

Emmett's counsel was an experienced public defender in Danville, Virginia, who had tried at least 15 murder cases, including two capital cases. He was assisted in his representation by an investigator employed by the public defender's office as well as a forensic psychologist appointed by the trial court to assist with the preparation and presentation of mitigation evidence. At the outset of the representation, counsel interviewed Emmett with the aid of a twenty-three page, comprehensive questionnaire specifically designed to obtain biographical information and explore all possible areas of mitigation evidence. The questionnaire was divided into separate sections covering nine categories of potentially mitigating evidence: family history, criminal history, employment history, environmental history, hobbies, medical history, mental health history, school history, and substance abuse history. Each section, in turn, contained specific and detailed questions to be covered with the defendant.

During counsel's interview, Emmett was cooperative and forthcoming about his background, family and upbringing. Emmett told counsel that he was unmarried and had a five-year-old daughter. He told counsel that his now-deceased biological father was an abusive alcoholic, that his mother and father separated and divorced when Emmett was an infant, that his mother remarried his current step-father shortly thereafter, and that his biological father had no role in Emmett's upbringing. Emmett was the youngest of five siblings from the marriage of his mother and father, but only he, his next oldest sister, and three half-siblings were raised together by his mother and stepfather. Emmett told counsel that he had a good relationship with his mother, stepfather, and the siblings that were raised in the home with him. He specifically *denied* any abuse, physical or emotional, and any major childhood difficulties with his mother and stepfather, told counsel that there "had never been any abuse to him or anyone else in the home," and told counsel that "there had not been any social service interventions involving anyone in his family." J.A. 431.

Emmett denied having received any mental health or substance abuse treatment, and stated that no one in his immediate family had a history of medical, mental, legal, or (outside of his biological father) chemical dependency problems. Although Emmett told counsel that he had received some court-ordered mental health counseling as a child, he explained that this was imposed as a result of a juvenile criminal incident committed when Emmett was seven or eight years old and that the counseling was discontinued by his mother because she thought it was

making him worse. Emmett denied having been diagnosed or medicated for any mental health condition at that time or thereafter.

In the course of counsel's interview, Emmett provided names of several family members and friends who could be contacted for information or as possible witnesses. Counsel interviewed Emmett's mother and step-father, his half-sister Lauri, and several friends. At no time did these witnesses alert counsel to the possibility that Emmett, contrary to his assertions, was abused or neglected as a child or otherwise contradict or call into question the information provided by Emmett.

Dr. Evan S. Nelson, the forensic psychologist appointed to assist defense counsel in the preparation and presentation of mitigation evidence, evaluated Emmett and prepared a written report. In the course of this evaluation, Emmett provided a family and social background fully consistent with that provided to counsel and was otherwise cooperative. Emmett told Dr. Nelson that he "got along well with his stepfather," described his mother as a " 'loving mother' who rearranged her schedule to be there to take care of him when he was growing up," and "denied having been physically or emotionally abused." J.A. 462. He also denied being raised by his older siblings and claimed "there was adequate money to meet his basic needs." *Id.*

Emmett also reported to Dr. Nelson an extensive and troubling juvenile and adult criminal history. Emmett confessed to being chronically truant beginning in elementary school and told Dr. Nelson that he was twice arrested during his elementary school years for breaking and entering a neighbor's home and a business, both of which he committed alone. Emmett also told Dr. Nelson that he was suspended multiple times in middle and high school

for various infractions. As noted by Dr. Nelson, Emmett's "account of his own criminal history [was] more damning than the actual records." J.A. 463. In addition to the two breaking and enterings committed during elementary school, Nelson's report outlined Emmett's other criminal activities:

At age 10, he had another breaking and entering and was sent to a training school. At age 11, he burned a trailer down "by accident." He explained that he was playing with matches, by himself, when he accidentally set the trailer on fire. This may have been a violation of probation for the B & E and he was sent back to yet another training school. At 14, he committed another B & E. He said that he was not guilty of this charge but did know who had done it, but the court convicted him. Then he added that he should have been found guilty of receiving stolen goods but he did not want to rat out his friend who had actually committed the B & E, showing strong criminal social values as early as age 14. He was placed in a non-secure juvenile facility and ran away four times. At that point he had never been gone for more than just a day.

They then sent him to a more secure facility called the Dylan Detention Center. He said he escaped from there three times. (Seven escapes even from non-secure facilities is evidence of planning and a persistent disregard for the rules of authority figures; it also showed short-term planning, given that each brief episode of freedom was followed by increased incarceration.) The last time he ran with two boys and he stayed in Tennessee at one of the boy's aunt's house for almost two weeks. He was charged with kidnaping, assault, and common law robbery as part of that escape. The kidnaping occurred when

he stuffed a guard in the closet. The assault occurred because he touched the guard to put him in the closet. The common law robbery occurred because he took the keys away from the guard, or so this is how he reported it. While on the lam, he stole some clothes off of a clothesline and incurred yet another B & E charge. He was in detention until his 18th birthday.

J.A. 463–64. After his juvenile years, Emmett related having convictions or charges for several DUI's, driving without a license, assaulting his girlfriend, second degree trespassing, possessing stolen goods, and vehicular manslaughter. Contrary to the evidence presented at his trial, Emmett denied that he was on the wrong side of the road when he struck the motorcyclist and told Dr. Nelson that the police placed the victim on the wrong side to fabricate evidence against him. Emmett also told Dr. Nelson that within a month after his release from prison for the vehicular manslaughter, he was arrested for having an open container of alcohol, charged with possession of drug paraphernalia, and charged with a fishing violation. With the exception of the court-ordered counseling when he was in elementary school, Emmett advised Dr. Nelson that he had undergone no mental health counseling or treatment.

Dr. Nelson also reported to counsel that Emmett was of average intelligence for the general population, above-average intelligence for an incarcerated male felon, and that his personality test revealed an antisocial personality trait, i.e., "an attitude that the world is a place of competition and one must take what you can get, and feel that you deserve it." J.A. 466. Dr. Nelson concluded that, although Emmett did not currently meet the criteria for "psychopath," he had traits of that classification and amply met the criteria for "Antisocial Personality Disorder," which "de-

scribes a pattern of criminal conduct." J.A. 467. In short, Emmett exhibited "the chronically unstable, impulsive, and opportunistic lifestyle of a career criminal." Id. Moreover, Dr. Nelson viewed Emmett as a career criminal with a pattern, "beg[inning] in childhood and continu[ing] into adulthood," of "commit[ting] property offenses for his own personal gain"—the same thing that motivated the capital murder offense. J.A. 468.

Ultimately, Dr. Nelson concluded, and advised counsel, that:

> Except for Mr. Emmett's addictions to alcohol and cocaine and the role they may have played in his urgent desire for money that night, there is little from this defendant's background that can mitigate the offense, in this expert's opinion. Mr. Emmett had done little with his life except live hand-to-mouth. There was no evidence whatsoever of an acute mental illness explaining the instant offense or Mr. Emmett's background, just a personality disorder. There were no credible reports of neuropsychological damage that would explain his pattern of conduct, either. His social history did not reveal mental retardation, severe abuse or depravity.

> There may be mitigation in the fact that Mr. Emmett had behaved while in adult jails and prisons, suggesting that he could be a good citizen within a highly structured and controlled environment such as the one he would experience if given life without parole.

Id. In view of his evaluation, Dr. Nelson recommended that counsel not call him as a witness because of the high risk of the prosecution using the lack of mitigation as aggravating evidence and advised that Emmett would be better served by lay witnesses, rather than an expert "who could be cross examined about Antisocial

Personality Disorder, psychopathy, and hypotheticals about future bad conduct Mr. Emmett might commit." J.A, 469.

In addition to the interviews conducted of Emmett's family members and friends and his review of the evaluation by Dr. Nelson, counsel obtained Emmett's available school records and the records of his prior incarceration as an adult. Counsel also attempted to obtain Emmett's juvenile commitment record, but was advised that those records had been destroyed. Counsel did not pursue obtaining a copy of the records from Emmett's juvenile court-ordered counseling. Neither Emmett nor the family members indicated that there was anything significant to find, testimony by people involved in his juvenile criminal history would have risked opening the door to Emmett's early and continuous criminal behavior, and Dr. Nelson reported no evidence of mental illness in his evaluation of Emmett.

From the interview with Emmett's mother, counsel also located and personally interviewed one of Emmett's juvenile probation officers, Molly Bergwyn. Ms. Bergwyn advised counsel that she became Emmett's probation officer when Emmett was approximately 8 years old. She "remembered Emmett as a sad little kid who ran away a lot," but told counsel that "she never noticed any violent behavior or reports of abuse." J.A. 431. Although she did recall Emmett's "living conditions as nasty—dirty trailers, lots of kids and not much attention," she was not overly critical of Emmett's mother. Id. Ms. Bergwyn told counsel that she believed that Emmett's mother loved him, but that she pos-

sibly lacked parental skills, and advised counsel that, in her opinion, there was "no abuse[,] just not a lot of attention." Id. In statements consistent with those of Emmett and his family members, Ms. Bergwyn also advised counsel that she remembered Emmett's stepfather taking Emmett hunting, trapping, and fishing, which Emmett loved, so there was "obviously parental involvement." Id.

Based upon Emmett's statements, the follow-up investigation, and Dr. Nelson's evaluation and recommendations, counsel made a strategic decision not to call Ms. Bergwyn or Dr. Nelson as witnesses. With respect to Ms. Bergwyn, counsel felt that she "could damage more than help" because her description of Emmett's home life, while not ideal, was at worse one of some neglect, but not of abuse or other atrocities. Id. On the downside, counsel feared that her testimony would serve to remind the jury that Emmett had been a "lawbreaker" since the age of eight, "over 20 years [and] 2/3 of his life." Id. Counsel likewise heeded Dr. Nelson's advice not to call him as a witness, as doing so would also have opened the door to Emmett's extensive criminal history beginning at age seven and his antisocial traits and career criminal personality—a history which the prosecutors were not privy to and which was unavailable to them via juvenile records. Without this support, counsel knew, the prosecutor's future dangerousness case was supported only by the single juvenile conviction, the attempted escape from the juvenile facility and related offenses, and the single adult conviction for vehicular homicide.[2]

**2.** Counsel was aware, through the Commonwealth's notice of prior convictions, that the Commonwealth either was not aware of or chose not to detail Emmett's extensive criminal behavior as a child. In state habeas proceedings, the prosecutor confirmed that he

"attempted to investigate and discover the extent of Emmett's juvenile criminal history for use in evidence at sentencing," and that he "wanted information about [Emmett's] criminal history as a juvenile to stress to the jury that he had a long history of criminal

Instead, counsel pursued a strategy to "humanize" Emmett and "persuade the sentencer that he ... is not a monster, but a person with some worthwhile qualities," through testimony from Emmett's family members and a close friend to demonstrate that he was "a helpful and responsible son, parent and friend until approximately 12 months" before the murder when he became involved in cocaine and underwent a noticeable change in behavior—a strategy that would have been directly undermined by evidence of an extensive juvenile and adult criminal history. J.A. 433. Building upon this testimony, counsel also developed and presented positive testimony of Emmett's good behavior while serving his North Carolina sentence and while awaiting trial in the Danville City jail, to stress Emmett's demonstrated *lack* of dangerousness in the prison setting, as well as the security and structure of the prison environment he would be placed in if given a life sentence.

### C.

■ Counsel's mitigation strategy, however reasonable and well-conceived at the time, was ultimately unsuccessful; the jury was not convinced that the mitigating circumstances of Emmett's character or his inability to control his weakness for intoxicating substances outweighed the aggravating circumstances of the brutal killing of his coworker. Only now, in the wake of Emmett's conviction and death sentence, habeas counsel has successfully gathered a number of affidavits from Emmett's siblings, half-siblings, and extended family members, as well as information gleaned from the childhood counseling ordered by the juvenile court, which paint quite a different picture of his childhood.

According to these affidavits, Emmett's family was very poor, his living conditions were dirty and unsafe, there was not always enough food, his mother and stepfather often fought, and the children were neglected and, at times, slapped, spanked, or otherwise physically abused. Records from the court-ordered counseling confirm that Emmett was brought to therapy by his mother after Emmett was arrested on charges of larceny at the age of seven, while Emmett was in the second grade. The records further indicate, however, that Emmett's family and living conditions were poor, that his hygiene was very inappropriate, that he might not have been receiving adequate care in the home, and that the therapy was ultimately terminated as a result of his mother's noncompliance. Finally, the new records contain information that one of Emmett's juvenile probation officers filed a neglect charge which was investigated by social services, although it did not result in either Emmett or his younger brothers and sisters being removed from the home.

In light of this new evidence, Emmett contends that his counsel's investigation was constitutionally deficient because, although counsel did interview Emmett's mother, step-father, and half-sister, he did not interview all of the siblings known to counsel and did not request the record from his court-ordered counseling. We disagree.

---

conduct and provide additional support for a finding of future dangerousness." J.A. 477. However, he too "learned that North Carolina law provides that juvenile records are destroyed 10 years after the juvenile reaches age 18" and "that any juvenile records concerning Emmett had been destroyed approximately a year earlier." *Id.* The prosecutor's attempts to locate witnesses who could testify about his juvenile record were also unsuccessful, leaving him with the evidence from the juvenile facility escape only. The prosecutor also confirmed that "[i]f [Emmett] had presented evidence that suggested additional criminal activities as a juvenile, [he] certainly would have made use of that evidence." *Id.*

As an initial matter, we point out the obvious fact that this new evidence in large part directly contradicts the information Emmett provided to his lawyer and the forensic psychologist appointed to work on his behalf to develop and present a mitigation case, as well as the corroborating information obtained during the investigation. As noted above, Emmett reported that he had a good relationship with his mother, his stepfather, and his siblings, and that he had maintained a good relationship with his parents into his adult years. He specifically denied any physical or emotional abuse to him or to his siblings, denied any DSS interventions into his home, and described his mother as a loving mother who rearranged her schedule to take care of him. He denied being raised by his older siblings and indicated that there was adequate money available to ensure that his basic needs were met.

In habeas proceedings, Emmett has not factually disputed that he provided this history to counsel, nor otherwise sought to contradict his earlier statements to counsel. He has also made no effort to personally set forth an account of his family and social history which differs from that obtained by counsel during his representation. In short, Emmett has presented no testimony or affidavit on his own behalf in the habeas proceedings. Rather, Emmett argues, without evidentiary support, that he was "unable to recall and describe the tragic circumstances of his own upbringing," but that this inability did not "absolve[ ] trial counsel of his obligation to conduct an adequate investigation and follow viable leads regarding Emmett's mental health and troubled family background." Reply Brief at 3–4 (internal quotation marks omitted). Emmett asserts that counsel should have anticipated that Emmett's family would not have told him the truth about his counseling history or other negative conditions of his childhood.

Having considered counsel's investigation along with the new evidence presented, the state habeas court ruled that "[c]ounsel was entitled to believe that the petitioner and his proffered witnesses, including friends and family, had informed counsel and petitioner's mental health expert of all relevant social history," J.A. 542, and made a reasonable decision to allocate their time and efforts towards the development of other types of mitigating evidence. On federal habeas, Emmett contends that the state court's determination was unreasonable, as it adopted what amounts to a per se rule that "[c]ounsel cannot be held ineffective for relying upon information supplied by his client." *Id.* We, however, do not read the state court's opinion so narrowly and, in any event, agree that counsel's investigation into Emmett's family background was not constitutionally deficient.

As noted above, a determination of the reasonableness of counsel's actions must be determined on a "case-by-case" basis. *Williams,* 529 U.S. at 391, 120 S.Ct. 1495. "A standard of reasonableness applied as if one stood in counsel's shoes spawns few hard-edged rules," and the merits of counsel's investigative choices may often be "subject to fair debate." *Rompilla,* 545 U.S. at 381, 125 S.Ct. 2456. However, "capital sentencing proceedings do not set at naught the basic principle of attorney-client relations: namely that counsel, for all their learning and experience, remain in the end the agents of the one most intimately affected." *Lovitt v. True,* 403 F.3d 171, 179 (4th Cir.2005). The importance of respecting the attorney-client relationship and the propriety of counsel relying upon the word of his client in the usual case were recognized by the Court in the *Strickland* opinion, which plainly states

that "[t] he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions," and advises that "[c]ounsel's action are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant." *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052. This reliance, the Court further noted, particularly extends to the investigation phase of counsel's representation:

> In particular, what investigation decisions are reasonable depends critically on such information [supplied by the defendant]. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions.

*Id.; see also Barnes v. Thompson,* 58 F.3d 971, 979–980 (4th Cir.1995) (holding that defense counsel "may rely on the truthfulness of his client and those whom he interviews in deciding how to pursue his investigation").

The constitutional argument that counsel should, instead, presume that his client, particularly one who is behaving in a cooperative and forthcoming manner, is being deliberately misleading, or that counsel should presume that the family members also possess a motivation to deceive, runs directly counter to this most basic premise. It would also place counsel in an impossible position-unable to trust the word of the client and his family members and always subject to professional challenge for a failure to interview every person identified to him and every person known who might contradict those interviewed.

Even if we could, under our limited federal review of the state court's adjudication, we would also not view this case as one that should be excepted from *Strickland's* recognition of the general propriety of counsel's reliance upon the word of his client. Emmett has provided no evidentiary support for the assertion that he was unable to recall his troubled background nor any evidentiary basis upon which to conclude that his counsel should have had reason to believe that Emmett was unable to do so. Indeed, given the specificity of the information he provided, it seems that Emmett was able to recall the details of his childhood.

Nor does this case fit within the criticisms of the Supreme Court's in *Williams, Wiggins,* or *Rompilla,* or the bases upon which the Court determined that counsel's representation was deficient in those cases. This is not a case in which counsel ignored his duty to investigate background information, engaged in a belated investigation of mitigating evidence, or failed to commission a social history report by a psychologist. There is no assertion that Emmett was intellectually challenged or that he was not aware of or did not understand the capital process and the importance of presenting mitigation evidence in the penalty phase. There is no claim that Emmett at any time suggested that counsel should not pursue or offer mitigation evidence or that he behaved in an unhelpful, hopeless, defeated, or despondent manner during his encounters with counsel or Dr. Nelson.

Nor is this a case in which counsel neglected to obtain and review his client's prior criminal record or prison records of his client's good behavior in a structured environment. On the contrary, counsel uncovered a wealth of information regarding his client's extensive criminal background, confirmed that the prosecution had not uncovered that same information and would be unable to rely upon it as aggravating evidence, and made strategic decisions to ensure that the door to that evidence remained closed.

This is also not a case in which counsel did rely solely upon the word of his client in making investigative and mitigation decisions. Counsel interviewed Emmett's mother, the stepfather who raised him from an infant, as well as the half-sister who grew up with Emmett, still lived in the family home, and had frequent contact with Emmett in his adult years. And, no evidence is present or exists that counsel should have anticipated that Emmett's family would also would lie or cover-up the truth about his childhood, or otherwise hinder counsel's efforts to build the most effective mitigation case possible.

Counsel also requested Emmett's school records and prison records and tracked down one of Emmett's earliest juvenile probation officers who, although indicating that his home was dirty and that his mother lacked parenting skills, *confirmed* Emmett's assertions that his mother loved him and that he had a good relationship with his step-father. Although counsel was made aware that Emmett received counseling at a young age as a juvenile offender, counsel was also told that the counseling was discontinued by the family because it was not helpful and advised by Emmett and his family that Emmett had never been diagnosed with or treated for a mental illness. The probation officer gave no indication that there was a childhood mental illness, and Dr. Nelson confirmed that Emmett displayed no signs of mental illness during his evaluation.

In sum, we agree with the state court's determination that counsel, given the information obtained during his background investigation, could reasonably have determined that neither further interviews with family members nor the juvenile counseling records would be helpful to his defense and that counsel's time and efforts were best spent pursuing the mitigation strategy outlined above and presented at trial. Accordingly, Emmett is not entitled to federal habeas relief.[3]

---

3. In his affidavit presented in the state habeas proceeding, counsel indicated that "Emmett gave me the names of family and friends to contact for information or as possible witnesses" and that "[m]y investigator and/or I contacted and interviewed Emmett' s mother, step-father and sister and other friends." J.A. 431. The state habeas court, in turn, stated in its decision that "[c]ounsel interviewed all the witnesses provided by petitioner and none of them reported the problems now claimed by petitioner." J.A. 542. Pointing to handwritten notes which indicate that Emmett gave counsel or Dr. Nelson the names of other siblings who were not contacted, Emmett contends that the state court's factual statement was unreasonable and, therefore, that we are compelled to review this case de novo. We disagree. Although it does appear that counsel did not interview every family member who was brought to their attention, we cannot say that the state court operated under the mistaken belief that counsel had done so. The state court was not presented with a factual dispute on this issue as counsel's affidavit plainly stated that he interviewed the "mother, step-father and sister". J.A. 431. Consequently, Emmett has not demonstrated, by clear and convincing evidence, that the factual basis for the state court's reasonableness determination was incorrect. Even if we believed otherwise, however, we would not grant habeas relief de novo as we agree with the state court's determination. Counsel's decision not to proceed beyond the interviews of the three family members did not render his investigation con-

## D.

■ Even if Emmett had established that his counsel's performance was unreasonable, Emmett would still not be entitled to relief because he also failed to demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* The state habeas court found no reasonable probability that, had the additional evidence of Emmett's childhood been presented, the jury's verdict would have been different. We cannot say that this determination was contrary to or an unreasonable application of *Strickland* and its progeny.

■ In death penalty cases, to assess prejudice, the court "reweigh[s] the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534, 123 S.Ct. 2527. Here, the aggravating evidence surrounding the murder was compelling. Emmett and Langley were coworkers and roommates at the motel. Emmett knew Langley's family and had been the recipient of Langley's generosity, both monetarily and in favors, in the past and on the night of the murder. Despite this personal relationship and Langley's generosity, Emmett walked calmly into their motel room, sat on his bed contemplating the murder, took the lamp from the table, quietly removed its lampshade and light bulb (presumably so he would not cut himself), and beat the sleeping, helpless victim to death for the sole purpose of robbing him because Langley had denied his request for another loan. In doing so, Emmett struck Langley

in the skull at least five times and with such ferocity that blood flew onto the walls, the foot of the bed and headboard, and to the opposite side of the room. He then removed Langley's wallet from his pocket and used the money to buy crack cocaine.

After killing Langley, Emmett concocted his lie for the police, calmly reported the murder to the motel desk attendant, and, when the police arrived and the situation became tense, tried to pin the crime on another coworker and supposed friend. Finally, when there was no more lie to spin, Emmett confessed to having acted alone. When questioned about the circumstances leading up to the murder, Emmett told the police that Langley was "an asshole" who "wouldn't loan me no money," J.A. 81, and that it "just seemed right at the time," J.A. 80, demonstrating a lack of remorse and callous disregard for human life similar to that demonstrated in the wake of his killing of the motorcyclist a few years prior.

In contrast to this devastating evidence, the evidence that Emmett has produced in habeas proceedings, and which he now contends should have been unearthed and presented during the sentencing phase, would have presented to the jury a picture of a difficult childhood environment. It was, however, comprised of at least as much bad evidence in aggravation as good evidence in mitigation, and the additional evidence in aggravation would have served to eliminate or at least substantially undercut the evidence in mitigation that was presented. According to the newly submitted evidence, Emmett had a difficult and neglectful childhood environment, with at least some physical abuse, but not one

stitutionally deficient and we find the investigation to have been reasonable under all the

circumstances.

deemed severe enough for social services to remove from the home either Emmett or his siblings when called to investigate. On the other hand, the additional evidence contained an extensive and extremely damaging juvenile criminal history which supported the prosecutor's future dangerousness and depravity arguments. As noted by the prosecutor, he "attempted to investigate and discover the extent of Emmett's juvenile criminal history for use in evidence at sentencing," and "wanted information about [Emmett's] criminal history as a juvenile to stress to the jury that he had a long history of criminal conduct and provide additional support for a finding of future dangerousness." J.A. 477. Thus, "[i]f [Emmett] had presented evidence that suggested additional criminal activities as a juvenile, [he] certainly would have made use of that evidence." *Id.*

Emmett acknowledges the aggravating nature of the additional evidence, but asserts that, had counsel presented the evidence along with the argument that it was because of these hardships that Emmett finally resorted to the extensive illegal behavior as a means of getting the attention of his parents, the balance would have been struck differently. We are unpersuaded.

In addition to opening the door to Emmett's extensive juvenile record, the evidence would have stripped Emmett of the mitigation strategy that was presented and invited the prosecution to argue the very point the defense hoped to avoid-that, instead of the relatively minor juvenile history known to the prosecutor and the single adult conviction for vehicular homicide, Emmett had a criminal history prior to this murder that spanned from the age of seven to the present, including damaging evidence that Emmett, even as a child, targeted friends, neighbors, counselors, and others with whom he had personal relationships as his victims. In sum, such an extensive history of criminal conduct from the age of seven would have substantially bolstered the prosecutor's argument that Emmett was a calculating, ruthless, life-long criminal who stopped not even to spare those close to him from his crimes and who would pose a danger to anyone who stood between him and what he wanted. Accordingly, whatever weight the additional social history might have added to Emmett's mitigating side of the scale, we agree with the state court's determination that it was more than offset by the aggravating nature of the evidence.

To conclude, Emmett's arguments suffer from the classic hindsight that we are cautioned not to apply to upset state court judgments. Had Emmett's counsel presented the evidence brought forth in state habeas proceedings and opened that door, he would be as likely to have encountered an ineffectiveness argument based on that decision as the one we face today.

> We refuse to place defense lawyers in this position. Trial counsel is too frequently placed in a no-win situation with respect to possible mitigating evidence at the sentencing phase of a capital case. Therefore, the best course for a federal habeas court is to credit plausible strategic judgments. To do otherwise would be a transparent misuse of the habeas court's power of hindsight.

*Lovitt,* 403 F.3d at 181 (internal quotation marks, alterations, and citations omitted). In light of the totality of the evidence presented at trial and in the state habeas proceeding, we conclude that Emmett has failed to demonstrate a reasonable probability that, but for counsel's failure to present the additional evidence of Emmett's background, the sentence would have been different. Accordingly, we cannot say that the state court's determination was contrary to or an unreasonable application of

*Strickland* and, therefore, Emmett is not entitled to relief.

## IV.

■ We next turn to Emmett's claim that his counsel unreasonably failed to request the assistance of a toxicologist or other substance abuse expert and to present expert testimony concerning Emmett's intoxication at the time of the offense as mitigating evidence during the penalty phase. According to Emmett, such an expert might have testified that the effects of cocaine and alcohol can cause impaired coordination and balance, an impaired ability to react to events, disturbed vision, euphoria, an increased sense of well-being, an increased sense of power, a loss of insight into events, impaired judgment, impaired or disturbed perceptions, difficulty concentrating, confusion, paranoia, visual disturbances, or hallucinations.[4]

The state habeas court rejected Emmett's intoxication claim, concluding that it met neither the "performance" nor "prejudice" prong of *Strickland's* two-part test. Specifically, the court noted that:

> While petitioner's court-appointed mental health expert informed counsel that he believed petitioner was intoxicated at the time of the offense, the expert also cautioned that petitioner made a choice to attack the victim and he "clearly knew what he was doing." Additionally, petitioner's own statement to the police indicated that he thought about robbing and hitting the victim in the head before actually committing the acts. Furthermore, because there was no evidence as to the precise amount of alcohol and cocaine he consumed on the night in

question, any expert testimony would have been based solely on speculation. Finally, counsel argued at the sentencing hearing that petitioner had addictions to both alcohol and cocaine and that these addictions "overwhelm[ed] his judgment" at the time of the murder. J.A. 535–36. Having reviewed the record, we cannot say that the state court's rejection of Emmett's intoxication claim was contrary to or an unreasonable application of Supreme Court precedent.

Although evidence of intoxication can be mitigating in certain circumstances, *see* Va.Code Ann. § 19.2–264.4(B)(iv) (2004) (setting forth, as mitigating, evidence that "at the time of the commission of the capital felony, the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was significantly impaired"), we agree that counsel's determination that the evidence in this case could not support such a claim was a reasonable one.

According to his confession, Emmett began drinking beer at approximately 6:00 p.m. and, over the course of the next five or six hours, consumed as much as a 12–pack of beer and smoked a sixteenth of crack with several of the other roofers. However, the evidence available to counsel indicated that Emmett was nonetheless calm and in control of his actions at the time of the murder. Emmett's coworker Michael Pittman confirmed that the men were drinking and that they smoked crack together on a couple of occasions, but he testified that the crack did not affect him very much because the quantity was small and each man only got two or three drags.

---

4. In his state habeas proceedings, Emmett argued that counsel was constitutionally ineffective for failing to present intoxication as a defense to capital murder in the guilt phase, as well as to the imposition of the death penalty in the sentencing phase. In this appeal, however, Emmett has limited his challenge to counsel's performance as it relates to the sentencing phase.

The hotel desk clerk, whom Emmett approached within a hour of killing Langley, stated that Emmett appeared normal and not nervous. He was "standin[g] straight, and he walked straight," and "nothing [was] wrong with his speech." J.A. 55. The police officers who responded to the scene and dealt with Emmett immediately thereafter also uniformly testified that Emmett was very calm and had no difficulty walking or talking to them. Emmett's own confession also indicates that he was calm and in control of his actions at the time of the murder; he told the officers that he "went in [the motel room], sat on the bed for a few minutes, ... thought about it, ... took the shade off the lamp and took the bulb out, ... unplugged it and ... hit John in the head with it." J.A. 75–76.

Dr. Nelson also interviewed Emmett about the circumstances of the evening, was aware of the substance use, and specifically addressed the question of "[w]hether the capacity of [Emmett] to appreciate the criminality of his conduct or conform his conduct for the requirement of the law was significantly impaired" in his report to counsel. J.A. 467. Dr. Nelson opined that Emmett "was intoxicated on the synergistic combination of cocaine and alcohol at the time of the alleged offense," and that such intoxication can "reduce[ ] anxieties that normally inhibit one from acting on impulses to do illegal acts" and agitate the perpetrator. J.A. 467–68. However, Dr. Nelson cautioned that, in this case, "Mr. Emmett voluntarily consumed these substances," "was experienced with the effects of alcohol and cocaine," "made a choice to attack his sleeping roommate and clearly knew what he was doing." J.A. 468.

In light of this evidence, we cannot say that counsel's representation was deficient because he did not seek out the assistance of another substance abuse expert or a toxicologist or that, had he done so, the result of the proceeding would have been different. Counsel and Dr. Nelson investigated a possible mitigation strategy based upon Emmett's substance use that evening, and counsel did argue in mitigation to the jury, based on the evidence presented and the mitigation witnesses, that Emmett had addictions to both alcohol and cocaine which had changed his personality in the months prior to the murder and overwhelmed his judgment at the time of the murder. Counsel, however, uncovered no basis upon which to believe that Emmett suffered from severe ill-effects of alcohol and cocaine and, on the contrary, Emmett's counsel was presented with uniformly consistent information that Emmett's behavior and speech throughout the evening and immediately after the murder were unimpaired and that he was in control of his actions at the time. Given this information, we cannot say that the Virginia Supreme Court's determination—that Emmett failed to demonstrate that his counsel's performance was deficient because he failed to hire and present a separate toxicologist substance abuse expert or that, had he done so, that the result of the proceeding would have been different—was unreasonable. For the same reason, we reject Emmett's challenge to the district court's denial of his motion to authorize funds for the appointment of a toxicologist or other substance abuse expert on federal habeas.

### V.

For the foregoing reasons, we affirm the district court's denial of Emmett's petition for writ of habeas corpus.

*AFFIRMED.*

GREGORY, Circuit Judge, concurring in part and dissenting in part.

I concur in Part IV of the majority opinion, which concludes that Christopher

Scott Emmett's ("Emmett's") counsel was not ineffective in failing to develop evidence of Emmett's intoxication for use during the penalty phase. I respectfully dissent from the majority's analysis and conclusion in Part III of the opinion. Counsel failed to investigate adequately Emmett's childhood, and counsel's inadequate investigation prejudiced the sentencing phase of Emmett's trial. The Supreme Court of Virginia unreasonably applied *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), in ruling otherwise.

## I.

The majority opinion provides a lengthy description of the facts related to Emmett's crime and a thorough exposition of counsel's effort to investigate Emmett's background. The opinion does not detail at length the facts related to Emmett's childhood of abuse and neglect. Because these facts are essential to analyzing Emmett's claim, I fully recount them here.

Emmett, born August 18, 1971, was the last of five children born to Barbara "Karen" McAdams ("Karen") and Bobby Emmett ("Bobby"). His birth home was unsanitary. Emmett's aunt, Joanne Bazemore ("Joanne"), remembered that the home was filthy and smelled of urine, a stench bad enough to make her eyes burn. She remembered dirty diapers that fell out of closet doors and urine-soaked mattresses that had to be taken outside for airing. In this home, the children were neglected. Joanne recalled that there were many times the children did not have enough to eat. While unsupervised, an older sister then two years old, Angela Emmett Wynn ("Angela"), sustained severe injury from an electrical shock after she was allowed to chew on a cord. Also while unsupervised, an infant

sister died, apparently from an asthma attack.

Approximately three months after Emmett's birth, his mother divorced his father, taking the children with her, she said, because Bobby was an alcoholic who could not keep a job. Bobby's second wife Glenda Mills ("Glenda") remembered that at some point thereafter, Karen left the children, dirty and underdressed, with a friend but did not return for them for over two days. When the children stayed with Bobby and Glenda for approximately one year, the couple never heard from Karen.

Karen and the children later moved to Roanoke Rapids, North Carolina, where Karen married Tommy McAdams ("Tommy") and had three additional children. Visitors to the McAdams home described it as dilapidated. The stairs had fallen off the front porch, so the children climbed up a tree to enter the home from the front; the back of the house was also difficult to access. Emmett's brother Bobby Emmett Jr. ("Bobby Jr.") remembered that bugs infested the house in the summer because none of the windows had screens, bats flew inside the house, and the one oil heater in the parents' bedroom could not keep the family warm in the winter.

The children in the McAdams home had little supervision. An older sister, Amy Walton ("Amy"), remembered that by age eight, she roamed the streets, without consequence, to avoid being in the house. Bobby Jr., who similarly roamed the streets, stated that "kids were always supposed to be watching kids" at home. J.A. 299. Another sister, Mary Emmett Floyd ("Mary"), remembered that their step-father Tommy was often working, but their mother was either idle at home or "running the streets." J.A. 305. The lack of supervision led to injuries. Mary fell off the front porch and suffered rib injuries that persist today. When still a baby,

Emmett fell down a flight of stairs and required emergency room care. Even though Tommy was home that night, he blamed and beat Amy for Emmett's fall.

The McAdams home was as unsanitary as Karen's previous home with Bobby. Glenda remembered piles of dirty clothes and dishes, the smell of urine, and dirty diapers that were left wherever a baby was changed. Emmett's siblings remembered the same, including trash cans that were full and sometimes overturned. Amy could not recall Karen doing laundry. If the children wanted clean clothes, they had to use the washboard and cold water (as there was no running hot water) to clean the clothes themselves. Before eating, the children had to find a dish and wash it.

The children were also malnourished, therefore Emmett was very thin as a child. Karen only served dinner and sometimes a tomato soup lunch. Emmett's siblings remembered that there was never enough food to eat, so the children regularly left the house to look for food. They occasionally had to steal food. More often, neighbors or the man working at a local ice cream shop fed them; other times, a local doughnut shop owner fed them on the way to school. Angela remembered that, strangely, her mother always had enough to eat and would not share with the children the cakes she lay in bed eating.

Fights were common. Karen and Tommy physically fought over Karen's spending habits. The family did not have much money, and Karen went to jail a few times for writing bad checks. Mary remembered that the family lost their trailer home because, unbeknownst to Tommy, Karen spent the money intended for its payment. Infidelity also caused fights, even a knife fight. Karen in particular had a reputation for sleeping with married men, and she often fought with their wives.

The children suffered physical abuse. Karen and Tommy beat Mary and Emmett with "anything that was handy." J.A. 306. Emmett received more beatings because he was rebellious; Mary went to school with marks from the beatings. Angela remembered not feeling safe in the home. She recalled that the children were so afraid of Tommy, especially when he was drinking, that they would climb down a tree from the second floor window to reach the bathroom behind the house without seeing him, or simply urinate on their bedroom floors. Emmett's half-sister Lauri McAdams Johnston ("Lauri") remembered that Tommy had a quick temper and slapped the children with little provocation. Tommy beat Emmett badly after one of his sisters threw him through a wall in the trailer. Bobby Jr. remembered that a caretaker beat Amy badly and locked Emmett and Bobby Jr. in their rooms.

Around 1974, the children's biological father, Bobby, picked up his three eldest children at school, without permission, and took them to live with him in Chesapeake, Virginia. Mary and Emmett, however, were too young to be in school and were therefore left behind. Amy, Bobby Jr., and Angela considered it a huge relief to go live with their father. They recalled that back in North Carolina, Tommy sometimes beat Emmett badly, dumped their plates of food in the trash just for "looking at him wrong," and locked them in a closet. J.A. 378. When Angela and Bobby Jr. returned to live with Karen and Tommy briefly, the situation had not changed.

Back in North Carolina, Karen forced the children to take the blame for her misdeeds. Mary remembered that when Karen's marijuana was found in the home, Karen blamed Emmett even though he was only ten or eleven years old. Lauri remembered that her mother told the children to confirm the lies she had told Tom-

my. Sometimes Karen left the home for weeks or months at a time.

Around this time, Emmett began to get in trouble, mostly for stealing items like food, fishing equipment, toys, bicycles, and cigarette lighters from neighbors and schoolchildren. Emmett was first arrested for stealing at age seven. In April 1979, Karen brought him to the Halifax County (North Carolina) Mental Health Center for treatment. A psychiatric social worker there noted that, in addition to stealing, Emmett "is prone to telling outrageous lies" and his "hygiene was most inappropriate. There was a distinctive odor of urine about him." J.A. 329, 335. The social worker recommended a battery of tests and made a note to investigate the family. Emmett's tests later revealed neglect:

> The obsession with food themes supplies support for feeling by school personnel that Scottie may not be receiving adequate care in the home. Some explicative stems include: "What worries me ... is food, when I'm going to it;" "I need ... food;" "It is hard to ... cook".... Projective testing indicated a tendency to be highly concerned with basic survival needs, especially food.

J.A. 333. The social worker recommended that the school consider reporting the McAdams home to the Halifax County Department of Social Services ("DSS") for investigation. She also diagnosed Emmett with reactive disorder of later childhood, a developmental disorder caused by persistent disregard of a child's basic emotional needs (e.g., comfort, stimulation, affection) or basic physical needs.

Karen and Tommy did not follow through with counseling for Emmett. Three months after his initial visit, records indicate that multiple canceled and no-show appointments interrupted his therapy and that attempts to get Karen to come

for sessions failed. After a year of no contact with the center, Karen returned to report that Emmett's behavior had worsened. She acknowledged that "she realizes his stealing is the result of lack of attention." J.A. 339.

Accordingly, in March 1980, the family re-initiated treatment. In mother-son play therapy, the therapist noted that Karen remained aloof from her son and that Karen and Emmett seemed unaware of how to interact with each other. Despite some initial progress in Emmett's behavior, the family eventually interrupted therapy. In August 1980, a juvenile court counselor noted that Tommy's involvement in treatment was essential to Emmett's progress but not forthcoming. A June 1981 report noted that Emmett's chaotic and disorganized family setting afforded him little opportunity for attention from his parents, that his parents did not comply with counseling, and that DSS was considering eventual residential placement for Emmett. The center terminated treatment "due to repeated unsuccessful attempts to re-involve the family." J.A. 341. In October 1981, a court order reinstated treatment one final time. Therapists saw Emmett, by then age ten, ten times, but Karen continued to miss appointments. For the second time, the center terminated Emmett's treatment "du[e] to lack of follow-through on the part of his family." J.A. 343.

Juvenile court reports confirm these accounts of Emmett's childhood. In 1980, a juvenile intake counselor preparing for Emmett's court appearance on charges of breaking and entering and larceny described the McAdams home as dilapidated and unkempt. When he visited, he wrote, the children were extremely dirty and the only furniture in good condition was a fully stocked gun cabinet.

The Chief Court Counselor filed a Child Abuse and Neglect Report against Karen

on March 3, 1981. He recommended that Emmett be placed outside of the home if the present conditions could not be fixed. The next month, a social worker reported that Karen resisted DSS involvement. When the social worker did succeed in visiting the home, she found that rotted food and dirty dishes filled the sink in a roach-infested kitchen; the furniture was dilapidated; the steps had fallen off the front porch and entry from the back of the house was difficult; all the children were unkempt and dirty; there was a lack of bonding between mother and children and among siblings; and the mother did not nurture or show any affection toward the children. The social worker concluded that the home was dysfunctional.

Two weeks after this visit, a juvenile court counselor filed another Child Abuse and Neglect Report after finding the McAdams home in total disarray during an unscheduled visit. He opined based on Emmett's age and the nature of his thefts that his stealing was the result of neglect and his resistance to authority was the result of lack of supervision.

The counselor filed another report in 1984, after Emmett was arrested for breaking and entering a neighbor's home and stealing a ten-dollar piggy bank. Emmett spent the money at a grocery store on soft drinks, potato chips, and ice cream. The counselor once again suggested that these acts were Emmett's way of seeking the attention he did not receive at home. The report also noted that Emmett, who had missed multiple days of school that year, had been required to repeat the fourth grade. The counselor recommended that Emmett be committed to the Division of Youth Services until his eighteenth birthday or placed in a residential treatment program. According to an update filed a month later, Emmett had not attended school for twelve consecutive calendar days. After being charged with three additional delinquent offenses on March 7, 1984, Emmett was finally removed from the McAdams home.

In preparing Emmett's mitigation case, trial counsel did not uncover any of the above facts regarding Emmett's childhood-facts habeas counsel uncovered by requesting North Carolina juvenile court and social services records, interviewing several of Emmett's siblings and relatives, and interviewing a probation officer and social worker from Emmett's youth. Unaware of these facts, counsel did not present them during the penalty phase of trial. Rather, counsel called just two witnesses from Emmett's family, Emmett's mother Karen and his half-sister Lauri, and asked them a total of three questions about Emmett's childhood. Counsel asked Karen to name and describe Emmett's birth father. Karen replied that Emmett's birth father, Bobby, was an abusive alcoholic who never took care of his family. Counsel asked Lauri whether she grew up with Emmett, to which she replied yes. These three answers were all that the jury heard regarding Emmett's childhood.

## II.

Emmett argues that his counsel was ineffective because he failed to retrieve Emmett's juvenile mental health records, review Emmett's juvenile court file, or interview additional relatives and juvenile authorities-sources that would have yielded the information described above. Instead, counsel called only two witnesses from Emmett's family, asked them the most cursory questions about Emmett's childhood, and left the jury with the impression that Emmett's life after infancy was "perfectly normal." Appellant's Br. at 8. Had counsel completed an adequate investigation and presented the credible evidence about Emmett's abuse and ne-

glect as a child, Emmett argues, there is a reasonable probability that at least one juror would have recommended a life sentence. The majority, however, siding with the Warden, finds that the district court properly upheld the state court's determination that counsel acted reasonably, especially given Emmett's criminal history and Emmett's statements to counsel, discussed below. I agree with Emmett and would grant his application for relief.

## III.

To prevail on an ineffective assistance of counsel claim under *Strickland*, Emmett must show that (1) his counsel's performance was deficient and (2) this deficient performance prejudiced the defense. 466 U.S. at 687, 104 S.Ct. 2052.

Under the first *Strickland* prong, counsel's performance is deficient where "counsel's representation [falls] below an objective standard of reasonableness" as measured by prevailing professional norms. *Id.* at 688, 104 S.Ct. 2052. When, as here, counsel's performance in developing a mitigation case is at issue, the relevant inquiry "is not whether counsel should have presented a mitigation case," but "whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the petitioner's] background was itself reasonable." *Wiggins v. Smith*, 539 U.S. 510, 523, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). That inquiry includes "a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time," *id.* (internal quotation marks omitted), and applies "a heavy measure of deference to counsel's judgments," *Strickland*, 466 U.S. at 691, 104 S.Ct. 2052. The Supreme Court has clarified further that a strategic choice made by counsel after a thorough investigation is "virtually unchallengea-

ble," whereas a strategic choice made by counsel after an incomplete investigation is reasonable only to the extent that "reasonable professional judgments" support the limitations counsel put on his or her investigation. *Id.* at 691, 104 S.Ct. 2052.

Under the second *Strickland* prong, prejudice exists where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052. "When a defendant asserts prejudice with respect to his sentence, the Court must 'reweigh the evidence in aggravation against the totality of available mitigating evidence.'" *Hedrick v. True*, 443 F.3d 342, 349 (4th Cir.2006) (quoting *Wiggins*, 539 U.S. at 534, 123 S.Ct. 2527).

Ultimately, this Court is tasked with determining whether the state court's adjudication of Emmett's *Strickland* claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1) (2000), or "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings," *id.* § 2254(d)(2).

## IV.

In assessing counsel's performance, the majority correctly states that an attorney's conversations with a defendant can be critical in determining whether the attorney acted reasonably in limiting his or her investigation. See *Strickland*, 466 U.S. at 691, 104 S.Ct. 2052. Nonetheless, for a host of reasons, it was not reasonable for counsel to rely on Emmett's bland depiction of his childhood and Dr. Evan Nelson's ("Dr.Nelson's") conclusion that "there is little in [Emmett's] background

that can mitigate the offense" in limiting his investigation. J.A. 432. While Emmett did omit (and, in some instances, misrepresent) details about his childhood, he did not indicate to counsel that further investigation would be useless or that he had identified "all relevant social history" for counsel, as the state court held. J.A. 542.[1] *Cf. Rompilla v. Beard,* 545 U.S. 374, 380–83, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005) (holding that defendant's statement, among other things, that his childhood and schooling had been normal did not extinguish counsel's duty to investigate). More importantly, however, counsel knew that Emmett had a history with the North Carolina mental health and juvenile justice authorities, but counsel did not know what that history entailed before he concluded that any details from that history did not fit within his mitigation strategy. I am more than willing to "credit [counsel's] plausible strategic judgments," a rule the majority faithfully invokes, so long as those strategic judgments are made after a reasonable investigation. *Lovitt v. True,* 403 F.3d 171, 181 (4th Cir.2005).

Counsel's explanation as to why he did not pursue Emmett's mental health and social services records, even though Emmett and his mother told counsel those records existed, is wanting. The majority notes that counsel investigated Emmett's school and prison records and tried to obtain Emmett's juvenile commitment records but was told those records had been destroyed. The majority does not offer a similar explanation as to why counsel did not seek Emmett's juvenile social services and mental health records. Instead, the majority credits counsel's post-hoc explanation (because, as counsel admits, his "file

notes are silent" as to his inaction, J.A. 433) that he must not have pursued those records because conversations with Emmett, his mother, and his half-sister suggested there was nothing significant to uncover, much less anything that would contradict the information already provided by Emmett.

This explanation does not mollify me as it does the majority; counsel's interviews with Karen and Lauri were wholly insufficient. During counsel's single interview with Lauri, he asked her only about Emmett's drug use and changes in his personality. Lauri explained: "[H]e did not ask me any questions about Scott's childhood or about our family situation when we were growing up. [Counsel] also never tried to talk to me outside the presence of my mother." J.A. 308. When deposed for the habeas proceedings, Karen explained that because counsel did not tell her what he would ask her on the witness stand, she felt unprepared to testify. As for her interview with the investigator from counsel's office, Karen shared:

> [I]t seemed to me like he was in a hurry to get it over with. He never asked us to show him family photographs or sign medical releases. He also never spoke to any of Scott's brothers or sisters. The investigator told me repeatedly that there was no danger of Scott getting the death penalty. He said that he really didn't think the prosecutor would ask for death in this case. For that reason, I was shocked when Scott was sentenced to death.

J.A. 317. A closer look at the substance of counsel's interviews, then, calls into question the reasonableness of his decision to

---

**1.** In addition, I find merit in Emmett's argument that because Dr. Nelson did not conduct an independent investigation and relied only on information supplied by counsel, counsel was especially ineffective for relying on Dr. Nelson's conclusions in lieu of completing a thorough investigation.

look no further than those interviews for mitigating evidence.

Furthermore, counsel did not, as the state court held in error, interview all of the witnesses whose names Emmett provided. I disagree with the majority that the state court's mistake is harmless. The majority writes that it "cannot say that the state court operated under the mistaken belief that counsel had [interviewed every family member bought to his attention]." That proposition, however, works both ways: as much as we cannot say that the state court operated under its mistaken determination of the facts, we cannot say that the state court did not. All that is before us is the state court's unambiguous, factually inaccurate statement that counsel *did* interview all of the witnesses Emmett named. In this regard alone, the state court's adjudication of Emmett's claim resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence. *See* 28 U.S.C. § 2254(d)(2).[2] Counsel never swore in his affidavit that he interviewed all of the witnesses whose names Emmett provided (in fact, counsel specifically stated that he "contacted and interviewed Emmett's mother, step-father and sister and other friends," J.A. 431), the Warden never argued as much, and both counsel's and Dr. Nelson's notes clearly indicate that Em-

mett provided the names of several siblings whom counsel did not interview. Four of Emmett's natural siblings, an aunt, Emmett's step-mother, a social worker, and a probation officer were available but not interviewed.

As the majority correctly observes, *Strickland* does not require counsel to interview these witnesses, but counsel made a decision to not use these witnesses' testimony before he knew what that testimony was.[3] This limitation on counsel's investigation was unreasonable. Two cases that reached the outcome the majority reaches today, *Burger v. Kemp*, 483 U.S. 776, 794, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987), and *Tucker v. Ozmint*, 350 F.3d 433, 441 (4th Cir.2003), are helpful examples. In those cases, counsel's actions were decidedly different from those of Emmett's counsel. In *Burger*, the Supreme Court deemed counsel's limited investigation reasonable because he interviewed *all* witnesses brought to his attention and discovered little that was helpful and much that was harmful. 483 U.S. at 794, 107 S.Ct. 3114. In *Tucker*, this Court held that counsel was not ineffective because he presented "a substantial mitigation case" based on the defendant's childhood abuse. 350 F.3d at 441. Emmett's counsel neither interviewed all witnesses bought to his attention nor presented a mitigation case of any

---

2. Likewise, the Supreme Court of Virginia unreasonably applied *Strickland* in holding that counsel's performance was also not deficient because "evidence that petitioner's father was an alcoholic and abusive was admitted at trial and heard by the jury through petitioner's mother." J.A. 541. Emmett's birth father, Bobby, about whom Karen testified, had no role in Emmett's upbringing beyond Emmett's infancy. Emmett's step-father, Tommy, was the abusive and neglectful paternal figure who colored Emmett's path toward juvenile delinquency. The jury never heard from Karen or anyone else about Emmett's life under Tommy's roof.

3. Counsel's attempting to use one juvenile probation officer, Molly Bergwyn ("Bergwyn"), as a mitigation witness, and then coming to the conclusion that her testimony could hurt more than help, does not relieve him of his duty to develop other, readily available sources of information. Moreover, counsel's abandonment of a portion of Emmett's mitigation case just nine days before trial because one probation officer (again Bergwyn) had potentially harmful testimony and another juvenile officer was retired and could not be found demonstrates how unsatisfactory counsel's investigation was to begin with.

substance based on Emmett's childhood abuse and neglect.

Notwithstanding counsel's failure to obtain Emmett's mental health and social services records, the information counsel had contained important clues. Emmett and his mother told counsel that Emmett received court-ordered mental health counseling as a child; counsel knew that Emmett, who reached only the ninth grade, repeated the fourth grade because of excessive truancy due to, according to Emmett, psycho-therapy sessions; counsel had school records indicating that Emmett's family phone was disconnected and his mother did not communicate with teachers; and counsel knew that a juvenile counselor described Emmett's childhood home as nasty and crowded. These red flags would have led a reasonably effective attorney to investigate further. *See Wiggins*, 539 U.S. at 527, 123 S.Ct. 2527 ("In assessing the reasonableness of an attorney's investigation ... a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further.").

For this reason, the majority's complaint that Emmett has neither testified nor produced evidentiary support to explain why he could not recall the details of his childhood for trial counsel is irrelevant. It is of no moment that Emmett either intentionally misled counsel or unwittingly suppressed memories of the abuse he suffered as a child. Counsel possessed independent sources of information indicating that Emmett had a history with various state agencies and suggesting that there may be more of Emmett's story to uncover. The law does not require Emmett to present "testimony or [an] affidavit on his behalf in [these] habeas proceedings," as the majority writes. Rather, *Strickland* and *Wiggins* compel us to ask: What external evidence did Emmett's counsel have that should have led him to investigate further?

## V.

The majority observes that Emmett did not grapple with the intellectual challenges that the defendant did in *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), stymie his attorney's efforts to investigate as the defendant did in *Rompilla*, or receive no investigation at all by counsel, as in *Wiggins*. Nonetheless, having engaged in the requisite "case-by-case examination" of the evidence, see *Williams*, 529 U.S. at 391, 120 S.Ct. 1495, I find that counsel's limited investigation still falls short of the standards set in *Wiggins, Rompilla*, and *Williams*. Counsel "uncovered a wealth of information" about Emmett's criminal background, as the majority emphasizes, but counsel certainly did not uncover *why*, according to the bevy of professionals who met the young Emmett, he had this criminal history. Indeed, a former social worker testified that the situation in the Emmett's home was one of the "worst [she's] seen," a "classic, text-book case of what you hear discussed as being the environments in which adults who have serious problems were raised." J.A. 315. At least one juror may have found this information dispositive.

Counsel also fell short of the standards articulated in the American Bar Association ("ABA") Guidelines that the Supreme Court regularly consults to measure reasonable performance. *See Wiggins*, 539 U.S. at 524, 123 S.Ct. 2527. Those guidelines "provide that investigations into mitigating evidence 'should comprise efforts to discover all *reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" *Id.* (emphasis added) (quoting ABA Guidelines for the

Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989)). The sources of mitigating evidence that Emmett's habeas counsel consulted, but his trial counsel did not, were "reasonably available." Thus, neither Supreme Court precedent nor the ABA Guidelines compels the majority's conclusion that counsel's performance was reasonable.

I note two cases where I declined to find counsel's performance constitutionally ineffective. The facts in both cases, *Hedrick v. True*, 443 F.3d 342 (4th Cir.2006) (Gregory, J.), and *Kandies v. Polk*, 385 F.3d 457 (4th Cir.2004) (Gregory, J.), *vacated on other grounds by* 545 U.S. 1137, 125 S.Ct. 2974, 162 L.Ed.2d 884 (2005), are distinguishable from those in Emmett's case. In the first case, *Hedrick*, we concluded that counsel was not ineffective in limiting his investigation once he learned that Hedrick's father abused alcohol, both parents used marijuana, and both parents preferred Hedrick to use drugs and alcohol at home rather than on the street. See *Hedrick*, 443 F.3d at 349–52. Additional investigation would have yielded only the information that Hedrick's parents fought frequently and his mother committed welfare fraud. Furthermore, a significant body of evidence that Hedrick's counsel did not pursue— the juvenile court file of Hedrick's brother, which indicated that the family home

was fragmented and dysfunctional—was not "reasonably available." The file belonged to a minor, Hedrick's brother, who could not sign a release granting counsel access after Hedrick's family refused to allow counsel to involve the brother in the case. These were the circumstances under which Hedrick's counsel reasonably decided to limit his investigation and to pursue only the strategy of persuading the jury that Hedrick was "a good kid ... led astray." *Id.* at 352.[4]

Emmett's case is distinguishable. Unlike Hedrick's counsel, Emmett's counsel failed to pursue records that were (1) related to his own client and (2) reasonably available. Further, Emmett's counsel ignored clues from interviews and from documents he already possessed, thereby missing evidence that Emmett had some type of agency intervention and an actual diagnosis. In short, counsel left undiscovered clear "cause and effect" evidence-cogent explanations by professionals as to why Emmett developed into a criminal. Counsel did not, as did Hedrick's counsel, neglect mere anecdotal evidence that his client's father drank and fought bitterly with a spouse-anecdotal evidence that likely would not have outweighed the aggravating evidence in the record.

In the second case, *Kandies*, the defendant was convicted for raping and murdering a four-year-old girl. Kandies argued that, in investigating his background, his

---

4. In fact, Hedrick could show neither deficient performance, as explained above, nor prejudice. The evidence of Hedrick's "less than idyllic upbringing" uncovered by habeas counsel would have been contradicted at sentencing by the testimony of Hedrick's family members and other witnesses. *Hedrick*, 443 F.3d at 351. In interviews with habeas counsel, an aunt and uncle decried Hedrick's childhood home. But witnesses at Hedrick's sentencing testified that Hedrick grew up in a normal family with wonderful parents and only recently became involved with a bad

crowd. *Id.* at 352. We concluded that "[g]iven the contradictory evidence on this point, it is not at all clear that [the] additional [mitigating] information outweighs the aggravating evidence supporting the jury's findings." *Id.* By contrast, in the instant case, the undeveloped evidence of Emmett's poor upbringing would have been *corroborated*, not only by the multiple family members counsel did not interview, but also by those family members counsel did interview, had he asked the correct questions. Emmett, therefore, can show prejudice where Hedrick could not.

counsel had a duty to ask Kandies whether he was sexually abused as a child because studies have found that men who commit child abuse are more likely than the general population to have been sexually abused as children. See *Kandies*, 385 F.3d at 470–71. We held that counsel was not ineffective in failing to ask the question, especially when counsel otherwise "thoroughly investigated Kandies's background." *Id.* at 471.

Again, Emmett's case is distinguishable. Kandies's counsel failed to ask a single question when no other evidence in the record would suggest the importance of asking that question. He otherwise thoroughly investigated Kandies's background. By contrast, Emmett's counsel did not thoroughly investigate Emmett's background: he failed to pursue substantial leads (from information already in his possession) that would have opened to him the true story of Emmett's childhood.

Emmett's case also differs from that of Kandies's because, in *Kandies*, we refused to deem counsel's actions unreasonable when counsel failed to pursue a general, sociological observation that sexual offenders tend to have been victims as children. Here, Emmett's counsel did not fail to pursue a statistical probability; he failed to pursue Emmett's documented history of receiving social and mental health services. Counsel's actions left undiscovered powerful mitigating evidence developed years before Emmett committed a crime as an adult. The conclusion drawn by a social worker in 1981, for example, that the young Emmett's home was precisely the kind of home in which adults with "serious problems" have been raised, has an undeniable credibility. J.A. 315. Stated otherwise, that 1981 conclusion very likely would have changed the vote of at least one juror deciding a sentence of life or death for Emmett twenty years later.

## VI.

The majority makes much of the fact that counsel was respecting Emmett by not assuming that Emmett was being less than forthcoming in describing his childhood. As support, the majority cites *Lovitt* for the proposition that counsel is always an agent of the defendant. Even the attorneys in *Lovitt*, however, obtained all of Lovitt's jail records, *all* of his juvenile records, and *all* of his medical records. See 403 F.3d at 179. The attorneys knew the extensive criminal history of Lovitt's family and the family's reputation in the community. See *id.* at 180. Armed with this information, they heeded Lovitt's request not to interview his family members, lest they "be accused of being ineffective for ignoring their client's wishes." *Id.* at 181. Counsel in the instant case was not similarly barred from speaking to Emmett's family, and counsel did not have the vast information about Emmett's past that the attorneys in *Lovitt* had before making a decision about the type of mitigation case to present.[5] The question is not, then, as the majority phrases it, whether the Constitution requires counsel to presume that a cooperative client or cooperative family

---

5. The type of mitigating evidence Lovitt claimed should have been presented to the jury also distinguishes Lovitt's case from that of Emmett. Lovitt's mitigating evidence was described as "occasionally contradictory." *Lovitt*, 403 F.3d at 182. Testimony described Lovitt's step-father as alcoholic and abusive, but Lovitt's juvenile records describe his childhood home life as clean, nicely furnished, stable, and loving. See *id.* There is no such contradiction or ambiguity in the mitigating evidence that Emmett argues the jury should have heard. While Emmett's description of his childhood to counsel and Dr. Nelson was misleading, all of the testimony and records habeas counsel has uncovered indicate that Emmett's childhood was beset by abuse and neglect.

184

member is being misleading. The question is whether a reasonable attorney, presented with the red flags apparent here, would have investigated further by looking to the readily available sources—e.g., Emmett's other siblings, Emmett's social services records—he knew existed. *See Wiggins,* 539 U.S. at 523, 123 S.Ct. 2527 ("[W]e focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the petitioner's] background was itself reasonable.").

## VII.

The majority concludes that, after indications from Emmett that his childhood was unremarkable, counsel conducted a reasonable investigation and put on a mitigation case that artfully avoided, as the majority writes, "bolster[ing] the prosecutor's argument that Emmett was a calculating, ruthless, lifelong criminal." I note that the lengthy criminal history counsel sought to minimize is largely one of stealing toys and food that began when Emmett was seven. Emmett's mental health records and juvenile court files, which counsel knew existed but did not seek and therefore did not know the content of, consistently attribute Emmett's theft to his parents' neglect. Counsel did not have the full picture of this neglect before concluding that this mitigating evidence could not outweigh the state's evidence that Emmett would be a future danger because he had been a criminal since age seven. Counsel's conclusion, which today becomes the majority's conclusion, might have been reasonable had it been reached after a

thorough assessment of the voluminous mitigating evidence available for Emmett. *Cf. Strickland,* 466 U.S. at 690, 104 S.Ct. 2052 (holding that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable").[6]

The majority holds that counsel was understandably reluctant to introduce mitigating evidence that would unwittingly become aggravating evidence. Yet counsel swore in his affidavit that "[t]he prosecution was *either unaware of or chose not to detail* my client's extensive criminal behavior from as early as age 7 or 8."

J.A. 423 (emphasis added). Since counsel was not *certain* that the prosecution did not know the extent of Emmett's criminal history, he had a duty to investigate that history in the event that the prosecution did know of that history and planned to use it in aggravation.[7] See *Wiggins,* 539 U.S. at 524, 123 S.Ct. 2527; *see also Rompilla,* 545 U.S. at 377, 125 S.Ct. 2456 ("[E]ven when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available, his lawyer is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial."). Indeed, as the majority notes, the prosecutor had attempted to investigate Emmett's juvenile records for use in aggravation.

The conclusion in *Wiggins,* then, is equally appropriate here:

6. Indeed, after assessing Emmett's mental health and social services files, and the testimony of additional juvenile officers and Emmett's several siblings, counsel may well have found evidence that fit within his strategy to "humanize" Emmett and "persuade the sentencer that he ... is not a monster." J.A. 433.

7. Counsel merely believed that the prosecution's aggravation case would rely only on Emmett's escape from a juvenile facility at age twelve, larceny conviction at age seventeen, and vehicular homicide conviction at age twenty-five-offenses that counsel had investigated.

Given both the nature and the extent of the abuse petitioner suffered, we find there to be a reasonable probability that a competent attorney, aware of this history, would have introduced it at sentencing in an admissible form.... [C]ounsel were not in a position to make a reasonable strategic choice as to [what] to focus on ... because the investigation supporting their choice was unreasonable.

539 U.S. at 535–36, 123 S.Ct. 2527. The *Wiggins* Court continued: "[H]ad the jury been confronted with this considerable mitigating evidence, there is a reasonable probability that it would have returned with a different sentence." *Id.* at 536, 123 S.Ct. 2527; cf. *Rompilla*, 545 U.S. at 393, 125 S.Ct. 2456 ("It goes without saying that the undiscovered mitigating evidence, taken as a whole, might well have influenced the jury's appraisal of [Rompilla's] culpability, and the likelihood of a different result if the evidence had gone in is sufficient to undermine confidence in the outcome actually reached at sentencing." (alteration in original) (internal quotation marks and citations omitted)). The majority is persuaded that the social history Emmett has presented during these habeas proceedings is "more than offset by" the "compelling" aggravating evidence presented at trial. I, in contrast, am persuaded that at least one juror, see *Wiggins*, 539 U.S. at 536, 123 S.Ct. 2527, might disagree.

In sum, Emmett's is "a case where counsel's failure to thoroughly investigate kept the jury completely in the dark as to" Emmett's childhood. *McWee v. Weldon*, 283 F.3d 179, 189 (4th Cir.2002). Because counsel made a "strategic" decision not to develop additional mitigating evidence after an investigation that was unreasonable by the standards set forth in Supreme Court precedent, and because at least one juror might have voted against death had the jury heard the extent of the abuse and neglect Emmett suffered as a child, I would grant Emmett relief.

## VIII.

For these reasons, I find that the Supreme Court of Virginia's determination of at least one of Emmett's claims was an unreasonable application of *Strickland.* Accordingly, I dissent from Part III of the majority's opinion.